STATE OF MISSOURI EX REL. J. W. MILLER ET AL., RESPONDENTS, v. BOARD OF EDUCATION OF CONSOLIDATED SCHOOL DISTRICT No. 1, HOLT COUNTY, APPELLANTS.*

Kansas City Court of Appeals. November 11, 1929.

*Corpus Juris-Cyc. References: Appeal and Error, 4CJ, section 2237, p. 491, n. 56; Mandamus, 38CJ, section 71, p. 593, n. 49; section 333, p. 732, n. 41; section 588, p. 869, n. 46; section 680, p. 919, n. 26, 27; section 712, p. 932, n. 94; Schools and School Districts, 35Cyc, p. 937, n. 38; p. 970, n. 67.

*J. B. Dearmont* for respondent.

*A. M. Tibbels* for appellant.

BLAND, J.—This is a proceeding in mandamus brought by certain resident taxpayers in consolidated school district No. 1, of Holt County, against respondents below, who constitute the board of education thereof. In their petition relators seek a writ of mandamus to be issued immediately to require respondents, the board of education, to "restore and establish common schools within your district known and designated as Dale Center and Liberty, such common or grade school or schools to be not more than two and one-half miles from pupils residing in said consolidated school district who are entitled to a grade or elementary school education."

The trial of said cause resulted in the court issuing a peremptory writ of mandamus directing respondents, as members of the board of education of said school district, "to restore and establish common or elementary schools within your district, . . . such common or grade schools to be not more than two and one-half miles of the nearest traveled road from pupils residing in said consolidated school district, who are entitled to a grade or elementary education."

The facts show that the consolidated school district in question was organized on June 14, 1913. The question of transportation of the school children of the district was not submitted to the voters at the time of the organization of the district. The territory embraced in the consolidated district is about twenty-four square miles, and topographically the district is approximately square. It was formerly contained in four common school districts commonly known as Dale Center, Liberty, Ross Grove and Minnesota Valley. The various boards of education of said consolidated school district, since its organization, had maintained and conducted elementary or grade schools in the school buildings located in said former common school districts heretofore mentioned, during the school year, until the beginning of the school year of 1924-1925, when they discontinued the use of the school buildings located in the territory formerly embraced in the Dale Center and Liberty school districts.

On the 19th day of July, 1913, the voters of the school district voted down a proposition for the issuance of bonds for the building of a high school building but voted in favor of acquiring a site for such a building. The site was thereafter acquired by the board of education. By popular subscription money was raised for the purpose of erecting a frame structure on the site provided for the high school building and a high school was conducted therein until the spring of 1922, when a new building of a substantial character was erected. The new building was constructed as a result of the voters of the district, on December 20, 1919, voting bonds ''for the purpose of erecting a school building'' on the site already provided. The question of transporting the school children to the Central building was voted down several times, the record showing that an adverse vote was had on this question in 1922 and again on May 7, 1923.

On June 30, 1916, the voters voted money for the erection of a new building in the Minnesota Valley district.

On June 14, 1923, a petition signed by at least twenty-five voters of the district was presented to the board requesting that an elementary school be opened in the Central building for the school year 1923-1924 and asking the board to accept $720 contributed by persons in the district to employ a teacher to teach the elementary grades in said building. This proposition was accepted by the board by a vote of three to two, those directors favoring the proposition being Griffith, Walker and Painter. The board thereupon employed a teacher and opened an elementary school in the Central school building where the high school was being taught.

There is testimony to the effect that the reason the board was petitioned for an elementary school in the Central or high school building was because the four elementary school buildings were old

and could not be properly heated and were not considered fit by the signers of the petition for their children. About twenty-four children living all over the consolidated district attended the primary school which was provided in the Central school building during the school year 1923-1924. This resulted in the number of school children attending the Dale Center school being reduced to six or seven and the Liberty school to seven, three of whom were non-resident pupils. There were three primary grade pupils from the Dale Center school who attended the Central primary school, nine from the Liberty, five from the Ross Grove and seven from the Minnesota Valley school, making twenty-four in all as before stated.

On April 7, 1924, the board employed three teachers to teach the primary grades in the consolidated district, two of whom were to be paid $5 each extra per month for janitor work. The third was to do no janitor work, indicating that she was to teach school in the Central building, as the board employed a regular janitor to take care of that building. This action of the board forecasted the possible closing of the Liberty and Dale Center Schools in the fall of 1924. On May 26, 1924, the board received a petition of over one hundred voters asking that it call a special election for the voting of "five cents additional for school purposes, and especially for the purpose of employing an elementary teacher to teach in the high school building." The voters on June 16, 1924, voted down this proposition. On August 7, 1924, the board held a meeting for the purpose of acting on another petition of the taxpayers asking for the submission of an increase of five cents on the $100 valuation for school purposes and one for a levy of twenty-five cents on the $100 valuation for the purpose of repairing and furnishing the four ward or grade schools. In compliance with the petition the board ordered an election which was held on June 23, 1924. The two propositions were voted down. The twenty-five cent levy lost by a vote of 195 against seventeen votes for.

At a meeting of the board held on August 25, 1924, it was found that there had been an attendance of less than ten in each the Dale Center and Liberty schools. The board consequently ordered these two schools closed and "decided that the pupils of said schools could attend school nearest to them," the board to furnish "transportation to pupils living over two and one-half miles from one of the nearest grade schools." The board also ordered that the janitor move the books, furniture and equipment from these two schools to the high school building. Thereafter the board furnished transportation to the Central building for the children in these districts who lived more than two and one-half miles from the said building.

In September, 1924, and after the closing of the Liberty and Dale Center Schools, elementary schools were opened in the Ross Grove

and Minnesota Valley grade schools and at the Central building, the board already having provided three teachers for grade school purposes. However, at the end of a month's time it was established that only eight pupils attended the Minnesota Valley school and nine the Ross Grove school, so the board closed these schools and moved the teachers to the Central builing where they taught grade school for the school year. The board also provided transportation for the pupils from these districts who lived more than two and one-half miles from the Central school house.

There was testimony that the decision of the board to employ a teacher to teach the grade classes in the Central building during the school year 1924-1925 was based upon the fact that twenty-five voters of the district signed papers requesting it for the reason that said voters considered the other buildings not safe or sanitary.

In support of their contention that respondents are required to re-open the old school buildings relators largely rely upon section 11260, Revised Statutes 1919, which reads as follows:

"The question of transportation of pupils may be voted upon at the special meeting above provided for, if notice is given that such a vote will be taken. If transportation is not provided for in any scchool district formed under the provisions of this article, it shall then be the duty of the board of directors to maintain an elementary school within two and one-half miles by the nearest traveled road of the home of every child of school age within said school district: Provided, transportation of pupils or the maintenance of elementary schools within two and one-half miles of each child of school age in the district shall not be required in consolidated districts now or hereafter organized under the provisions of this article where such consolidation has not placed said children further from an ·elementary school than they were prior to said consolidation: Provided further, that when the average attendance in any elementary school for any month falls below ten, the school board shall have authority to close such elementary school for the remainder of the term and provide transportation for the pupils of such elementary school to some other elementary school or schools in said district. Such transportation shall be paid out of the incidental funds of the district: Provided, further, that if transportation is not provided for, any consolidated district may, by a majority vote at any annual or special meeting, decide to have all the seventh and eighth grade work done at the Central high school building, provided fifteen days' notice has been given that such vote will be taken. Such seventh and eighth grade work at the Central high school may be discontinued at any time by a majority vote taken at any annual or special meeting."

This section has been amended (See Laws of 1927, p. 436), but we need not pass upon the effect of the amendment in view of our conclusion in reference to the merits of the case.

It is the contention of the relators that respondents and other patrons, who relators say lived near the high school building, for their own convenience, have pursued an arbitrary course looking toward the closing of the old school buildings without the consent of the voters. In this connection relators say that there was no urgent demand in the fall of 1923, coming from the patrons of the district, for a fifth primary teacher to teach the primary grades at the Central high school building, as the primary schools were not crowded but on the other hand had more room than was necessary to take care of the primary pupils in the district; that the proposition in the spring or summer of 1924 of employing a primary school teacher to teach in the Central school building so that a grade school could be taught there during the coming year, was for the purpose of reducing the attendance at the Liberty and Dale Center schools to below ten as the action of the board in conducting the primary grades in the Central school building the year before had brought about, and it was also the intention of the board at said time in 1924 to bring about the same result as to the remaining two elementary schools; that this plan was decided on by the board on April 7, 1924, before it received any petitions from the patrons concerning the matter of employing a teacher for the Central building for the coming year; that they tried to have their intention of placing the primary teacher in the high school building and paying her out of the school funds ratified by the voters of the district on June 16, 1924, but failed even to get a majority vote for this plan; that the voters had already refused to vote transportation of the pupils to the Central building and the submission of a levy of twenty-five cents for the repairing of the elementary school buildings was merely for the purpose of propaganda; that this is evidenced by the testimony showing that at least one of the directors did not vote for the proposition and no plan of repair was submitted to the voters at this time; that their lack of good faith is also shown by the fact that the board made orders closing the Liberty and Dale Center schools and placed a primary teacher in the high school building the same day that they cast up the election on the twenty-five cent levy for the repair of the elementary buildings, and the board refused to transport pupils to any place except to the high school building; that the reason assigned for closing these buildings because they were in a dilapidated condition was not in good faith as school had been conducted in them and the directors had never complained that they were out of repair or of lack of funds for their repair; that the district had never voted down any other proposition to raise funds to

repair or rebuild these ward school buildings, except the twenty-five cent levy, which was not submitted in good faith, the directors voting against the twenty-five cents themselves; that they wanted it voted down so as to have an excuse to close the other school buildings; that the directors have not kept faith with the voters for the reason that the money was originally voted not to erect a Central building for the use of the elementary grade pupils but for a high school building exclusively.

We are not called upon to decide whether the facts in this case come within section 11260, requiring the maintenance of a grade school, under certain circumstances, within two and one-half miles of the nearest traveled road of the home of every child of school age within the district, as contended by relators, for the following reasons: It is well settled that "the relief asked in the petition is the only relief that can be granted on final hearing." State ex rel. Mills v. Turnage, 263 S. W. 497, and cases cited therein, and "the peremptory writ should strictly follow the alternative writ." [38 C. J. 932.] And it is equally well settled that a board of education cannot be required to conduct school in certain locations within the district unless it is first shown, among other things, that suitable buildings in which to conduct said schools are at said locations or that sufficient funds have been provided with which the board can construct suitable buildings at such locations. [Good v. Howard, 92 N. E. 115, 174 Ind. 358; Dutton v. State, 87 N. E. 733, 172 Ind. 59; 38 C. J., p. 732; Section 11241, R. S. 1919.] In Mechem's Public Offices and Officers, p. 627, it is stated: "The party applying for the writ must show by his application that all the conditions exist which are necessary to create the duty. They must not be left to inference."

There is much evidence on the part of the respondents tending to show that it would require a considerable amount of money to place the ward school buildings, other than the Minnesota Valley school building, which the prayer in the petition for the writ does not involve, in a condition fit for the attendance of school children. There was testimony on the part of respondents tending to show that the re-building of some of these structures would be necessary for this purpose. The evidence on the part of the relators is not nearly so strong as to the dilapidated condition of these buildings as that of respondents, but relators' testimony shows that it will be necessary to expend a substantial sum of money on the buildings involved in this proceeding in order to make them fit for school children. Regardless of this, there is a certain amount of discretion vested in the school board in determining as to whether or not buildings are in fit condition for use. There was testimony, unobjected to, that one of the reasons the board closed the buildings involved herein

was because they regarded them as unsafe and unfit for children. The action of the school board in opening the grade school in the Central building is entirely consistent with the idea that the. other buildings were unfit. Mandamus is not for the purpose of reviewing discretionary matters. [State ex rel. v. Dickey, 280 Mo. 536, 553; State ex rel. v. Turnage, supra.] However, it is not a question as to what condition the ward buildings involved herein were in at the time they were closed but what condition they were in at the time of the issuance of the peremptory writ. [State ex rel. v. Williams, 68 Conn. 131, 155.] The suit was tried in January, 1926, and judgment rendered on March 12, 1926.

The evidence is undisputed that it would require a substantial amount of money to put these buildings in shape for school houses before they can be used, yet relators made no effort to show the financial condition of the district while on the other hand there was ample testimony that the district was without funds to repair these old buildings. The court did not find that there were suitable buildings in which to open the schools ordered opened by him.

The petition for the writ does not ask that the board take any action looking toward raising funds for the purpose of repairing the buildings in question, but prays that it be required to immediately restore and establish common schools in the district known as Dale Center and Liberty to be not more than two and one-half miles from pupils residing in the district. Relators have failed to establish the presence of all of the conditions necessary to create the duty upon the respondents of immediately establishing the schools sought by relators.

However, aside from this we do not think there is any merit in this application for a writ of mandamus on any theory. There was no fraud or corruption alleged or shown on the part of the members of the board of education and the courts are not justified in inquiring into their motives, provided their action is otherwise legally justifiable. "Motives can rarely be a subject of inquiry where the act done was in the exercise of a clear legal right." [Moran v. McClearns, 4 Lans. (N. Y.) 288, 290, 291.] We think there is no question but that the board of education was within its rights when it exercised its discretion to open a grade school in the high school building in each of the school years, 1923-1924 and 1924-1925. There is no question raised concerning the adaptability of the Central or high school building for this use or that there was not sufficient room in it, after taking care of the high school pupils, for the opening of a grade school therein. So we are not called upon to decide what would be the result had the board interfered with the high school pupils in opening the primary school in the building. From all the evidence shows it appears that there was sufficient and suitable room

in the high school building for conducting a grade school of the kind that was requested of the board at the time, and we would not be justified in saying that the board abused its discretion in the matter under all of the circumstances.

It may be, and no doubt was, a direct result of the opening of this grade school in the Central building that the number of pupils in the Liberty and Dale Center schools was reduced to less than ten. Of course, under the provisions of section 11260, the board was authorized to close these schools when the attendance dropped to under ten during the term under these circumstances and to provide transportation for the pupils to some other elementary school in the district. This proceeding is not to compel the board to transport children to some other grade school, so we need not pass on whether the Central building was the right one under the law to which to transport the Liberty and Dale Center pupils upon the closing of these two schools.

It is claimed by the relators that to permit the closing of the two schools in question by the directors would be permitting, in effect, the board to move a school without the consent of the voters of the district. However, if it can be said that such is the effect of their action, it would make no difference for the reason that it is well settled that the board can move a school in a consolidated district without the consent of the voters. [Velton v. School District, 6 S. W. (2d) 652; Gladney v. Givson, 208 Mo. App. 70.]

Section 11260, does not attempt to state under what circumstances the average attendance in elementary schools for any month should fall below ten for the statute to operate, but merely provides that if the attendance does as the statute mentions the board may close the school for the remainder of the term. Had the board done something to prevent children from attending or made it undesirable for them to attend school in these old buildings a different question might be presented, but the only action on its part complained of is in opening the grade school in the Central building and offering to transport children to it. We, therefore, are of the opinion that the board's action in opening a grade school in the Central school building in the school year 1923-1924, was within its discretion, and the fact that it resulted in reducing the attendance of the two schools in question to below ten is not material. In this controversy the only material question is whether the attendance was reduced below ten.

It is true that the board closed these two schools in the fall of 1924 without having opened them to see whether or not the attendance would fall below ten. The evidence shows that before it closed them the board investigated the question as to whether or not there would be ten children attending the school in each of these

two schools during the coming school year and found that, in view of the fact that the board intended to continue primary school at the Central school building, that such attendance would fall below that number. Therefore it closed the schools. The statute should not be given such a literal construction as to require the board to do a useless thing, that is, to open up schools where it was shown in advance that their act would result in heaping unnecessary expense upon the district and the waste of school money. Had it opened these schools no doubt the board would have been required to employ school teachers for the whole school year and to go to other unnecessary expenses when it was a foregone conclusion that the average attendance for the first month of the schools would fall below ten. In view of the fact that it had been established by the experience over the previous school year that less than ten pupils would attend these two schools under the circumstances that were going to be present during the next year to cause a like falling off of attendance and the fact that the board investigated and found there would not in the future be ten pupils attending each of these two schools, we think the board was within its discretion in closing the schools under the circumstances. As before stated the motives of the board in opening the primary grades in the Central building and continuing the same during the school years 1923-1924 and 1924-1925, is not a matter that we may inquire into.

However, we are not seriously impressed with the contention of the relators that the motives of the board were unethical. The evidence shows that one of the directors who voted for the opening of the primary school in the Central building in the fall of 1923 had no children, and that Walker, another of the three directors who voted in favor of this proposition, lived three and one-half miles from the Central building. The testimony shows that not only persons living near the Central building petitioned for a grade school therein, but those living in all parts of the district. The fact that twenty-four of the grade school pupils elected to attend the Central school during the school year 1923-1924, and the inference from the evidence is that these constituted almost if not a majority of all such pupils in the consolidated school district, tends to show that the directors were attempting to accommodate a large number of the families in the district having school children.

It may be that the directors had concluded on April 7, 1924, when they employed three teachers, only two of whom it is quite evident they intended to have teach in the old grade schools, that it would be necessary for them to close the Liberty and Dale Center schools (although they could have employed another grade school teacher later), and it was their intention to use any legal means at their disposal to continue the grade school theretofore held in those two

schools and at the Central high school, regardless as to whether their action would result in the closing of the Liberty and Dale Center schools. In addition to this it may be that they did not intend to vote for the twenty-five cent levy for the repair of the old schools. But these things did not make their conduct illegal or necessarily unethical. It would appear from the testimony that the reason they submitted this proposition of the twenty-five cent levy was because they were petitioned to do so. No doubt it was then the thought of the board that they would be accommodating a large number of the people in the district by continuing the grade school in the Central building and it was their intention in submitting this levy to fortify their position as much as possible, giving the voters an opportunity to pass upon the proposition in an indirect way of continuing the old schools.

We do not find that the board deceived the voters in submitting the bond proposal for the new Central school building in 1919. The proposition submitted was to erect "a school building." There was nothing in the proposition about a high school building. The resolution read: "It would be to the best interest to all concerned, if a building was erected large enough to accommodate all the pupils in the district."

As before stated we are not called upon to pass upon the ethics of the situation but we are not convinced that the board was actuated by bad motives in desiring the result that was brought about.

Being of the opinion that the relators are not entitled to the relief prayed for it is not necessary for us to pass upon the question of whether the judgment is void as granting a relief broader than that asked in the petition for the writ.

Relators have filed a motion to dismiss the appeal. It is claimed that the bill of exceptions was not filed within the time allowed by the trial court. There is no merit in this contention for the reason that under the provisions of section 1460, Revised Statutes 1919, the bill of exceptions may be allowed and filed "at any time before the appellant shall be required by the rules of such appellate courts, respectively, to serve his abstract of record."

It is claimed that appellants have failed to print certain exhibits introduced in evidence. One of these is the petition filed with the board of education asking that a subscription school be taught at the high school building in the fall of 1923. However, the respondents in their brief state that this petition was never introduced in evidence because they have never been able to obtain it from the appellants. Of course, it would be improper for the appellants to print anything in the bill of exceptions that did not become a part of the same by having been introduced in evidence. Most of the testimony adduced at the trial was wholly immaterial to the issues,

and we find that the exhibits which it is claimed were introduced in evidence but not printed in the abstract of the record, would throw no light whatever upon the merits of this controversy. For instance one of the exhibits not printed was exhibit 3 which the record shows is a copy of the plat showing the boundaries of the district.

The motion to dismiss the appeal is overruled and the judgment of the trial court is reversed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.